IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN NICHOLAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 09-134-SLR |
| | ) | |
| CPL RAMONE CARTER, | ) | |
| LT. LANCASTER, C/O JOHN DOE, | ) | |
| MS. QUEEN,  and C/O DUTTON, | ) | |
| | ) | |
| Defendants. | ) | |

John Nicholas, Plaintiff, pro se.

Marc P. Niedzielski, Esquire and Michael F. McTaggart, Esquire, Deputy Attorneys General of the State of Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants Carter, Lancaster, & Dutton.

James E. Drnec, Esquire of Balick & Balick, LLC, Wilmington, Delaware.  Counsel for Defendant Queen.

**MEMORANDUM OPINION**

Dated:  September 10 , 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On March 3, 2009, John Nicholas ("plaintiff") filed this action under 42 U.S.C. §

1983 against Cpl. Ramone Carter ("Carter"), Lt. Lancaster ("Lancaster"), Correctional

Classification Officer John Doe, Ms. Queen ("Queen"), and Matthew Dutton ("Dutton")

(collectively, "defendants") in their individual and official capacities alleging a

deprivation of constitutional rights due to a failure to act on his complaints of being in

danger of being sexually assaulted by his cellmate, followed by subsequent assault.

Plaintiff filed a grievance on each claim in this complaint and, plaintiff claims,

exhausted all remedies within the DOC. (D.I. 2 at ¶ 13)  Plaintiff previously filed for a

preliminary injunction, a temporary restraining order, and request for counsel. (D.I. 4;

D.I. 7; D.I. 11; D.I. 29)  The court denied these motions on September 18, 2009. (D.I.

52 at ¶ 1)  The parties have conducted limited discovery, and defendants Carter,

Lancaster, Dutton (collectively, "State defendants") and Queen now move for summary

judgment on all claims.  (D.I. 51, 53)  The court has jurisdiction pursuant to 42 U.S.C. §

1983 and 28 U.S.C. §§ 1331, 1343(a)(3).  For the reasons that follow, the court grants

in part and denies in part defendants' motions for summary judgment.

## II. BACKGROUND

Plaintiff John Nicholas is a prisoner of the State of Delaware, and was in custody

at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware at the

time of the complained-of incidents.  (D. I. 2 at ¶ 7)  While in custody at JTVCC, plaintiff

was housed in Building 21, unit A in a two-man cell with cellmate Barnard Drozdowski

("Drozdowski").  (Id. at ¶¶ 15,16)  State defendants are employees of the Delaware

Department of Correction ("DOC"); defendant Queen is a mental health employee of
Correctional Medical Service ("CMS"), the medical provider at JTVCC, who at all
relevant times held the position of staff clinician or therapist in Building 21. (*Id.* at ¶¶ 8-
12; D.I. 19 at 2)  Defendant Carter was at all times relevant to this case assigned to the
JTVCC and, plaintiff contends, legally responsible for operations in units A, B, C, and D
of Building 21. (D.I. 2 at ¶ 8)  Defendant Lancaster is a correctional officer with the
DOC, assigned to JTVCC and, plaintiff contends, was at all relevant times responsible
for the overall operation and supervision of defendants Carter and Doe in Building 21.
(*Id.* at ¶ 9)  Defendant Dutton is a correctional officer with DOC who, plaintiff contends,
at all times relevant held the position of inmate grievance chairperson ("IGC") and was
legally responsible for the grievance procedure at JTVCC. (*Id.* at ¶ 12)

Plaintiff, on October 13, 2008, submitted a request for protective custody to
mental health.[1] (*Id.* at ¶ 23)  On October 15, 2008, Drozdowski again made sexual
comments towards plaintiff, despite the fact that two days earlier plaintiff asked him not
to make such comments anymore. (*Id.* at ¶¶ 14, 17-18)  When plaintiff told Drozdowski
that he would alert a correctional officer if Drozdowski continued to make such
comments, Drozdowski became violent, pushed plaintiff against the wall, and
threatened to kill him if he "snitched." (*Id.* at ¶¶ 19-22)  Plaintiff feared Drozdowski
would rape him, and alleges that he expressed these fears to Carter about one half-
hour after the above altercation. (*Id.* at ¶¶ 22-24, 29-31)  Plaintiff alleges that Carter

---

[1]This "sick call" slip reads, "I am having problems with my cellmate . . . . he . . .
made a sexual comment to me.  I would like for someone to see him or move me.  I
need to be on [protective custody].  I feel uncomfortable w[ith] him!"  The sick call slip is
not addressed to any particular mental health professional. (D.I. 2, ex. D)

was dismissive of his request to be moved or placed in protective custody, despite the fact that he allegedly stated that Drozdowski's previous cellmate "signed on" for protective custody for similar reasons.[2]  (*Id.* at ¶¶ 26-28, 31-33)  Carter denies that plaintiff ever requested to be moved out of his cell due to fears of Drozdowski.  (D.I. 52 at ¶ 11)  Carter also denies any personal knowledge that Drozdowski was a risk.  (*Id.*)

Plaintiff alleges that, while Carter escorted him to an unrelated hearing on October 15, 2008, plaintiff again pleaded to be placed in protective custody.[3]  (D.I. 2 at ¶ 35)  Plaintiff alleges that, in response, Carter stated he could talk to mental health to see if they would help because he was not going to.  (*Id.* at ¶ 36)  Approximately one hour after Carter escorted plaintiff back to his cell, he returned to take plaintiff to a meeting with Queen.[4]  (*Id.* at ¶ 37)  At this meeting, plaintiff told Queen about Drozdowski's threats and sexual comments.  (*Id.* at ¶ 38, D.I. 53 at ¶ 10)  Plaintiff contends that Queen was dismissive and joked about the nature of Drozdowski's threats.  (D.I. 2 at ¶ 39)  Specifically, plaintiff claims that Queen "started to laugh and asked if it was 'man love.'"  (D.I. 2 at ¶ 39)  Defendant Queen denies that plaintiff told

---

[2]Plaintiff states that when he told Carter he needed to talk about something, Carter responded, "is it about your 'crazy celly' becaus[e] if it is, I know about him[.] [H]e's a 'crazy, homo freak.' I know and so does everyone els[e], that's why his last cell-mate left[.] [H]e could not deal with Drozdowski so he 'signed on' [protective custody]." (D.I. 2 at ¶¶ 26-28)

[3]Defendant Carter does not recall any conversation with plaintiff during which he requested placement in protective custody, or made any other complaint. (D.I. 46 at ¶ 13)

[4]Plaintiff contends that this meeting was in response to his October 13 sick call slip (D.I. 2, ex. D), whereas defendant Queen denies this allegation because she does not recall receiving an October 13 sick call slip from plaintiff. (D.I. 2 at ¶ 38; D.I. 19 at 2-3)

her of Drozdowski's behavior and that she laughed or used the phrase "man love" during her meeting with plaintiff. (D.I. 19 at 3)  Plaintiff requested that he be placed in protective custody because he was afraid for his life. (D.I. 2 at ¶ 40)  Queen explained that she had no power to move plaintiff or his cellmate; rather, it was DOC's job.[5]  (D.I. 2 at ¶¶ 40-41; D.I. 53 at ¶ 10)  While being escorted back to his cell after this meeting, plaintiff again asked Carter for protection, but Carter told him not to ask again and threatened him if he did.[6]  (D.I. 2 at ¶¶ 41-42)

Plaintiff asserts that the following day (October 16) he wrote a letter to Lancaster explaining Carter's denial of protective custody, and again requesting placement in protective custody. (*Id.* at ¶ 46; D.I. 2, ex. C)  Lancaster, however, never wrote back. (*Id.* at ¶ 47)  Lancaster avers that he never received any correspondence from plaintiff, and State defendants' brief points out that plaintiff stated in his deposition that he did not know whether Lancaster ever received the letter. (D.I. 52 at ¶¶ 7, 9)  That same day, plaintiff filed a grievance requesting to be placed in protective custody, or moved to another cell or tier. (D.I. 2 at ¶ 48; D.I. 2, ex. B)  Plaintiff asserts that Dutton failed to respond to the grievance in a timely manner, not answering until approximately one month later (on November 13, 2008) and claiming that it was too late to take action as

---

[5]Queen concedes this statement for the purposes of this motion only.  (D.I. 53 at n.12)  In her answers to plaintiff's interrogatories, she states that she does not recall plaintiff's request for protective custody.  (D.I. 49 at ¶ 13)  Queen states that she met with Drozdowski later that day for a mental health evaluation, which she states gave her no cause to believe that he was a threat to plaintiff.  (D.I. 53 at ¶ 10; D.I. 53, ex. C)  Plaintiff has not contested this point.

[6]Plaintiff's complaint asserts that Carter's exact words were, "Don't ask me again! Or I'll f— you up." (D.I. 2 at ¶ 42)

4

plaintiff was no longer housed with Drozdowski at that point.[7]  (*Id.* at ¶¶ 49-51)  Dutton states that on October 23, 2008, he received the grievance dated October 16, 2008; he denied the grievance because the relief sought (cell reassignment) was not grievable and because plaintiff had already been moved out of his cell by the time of the receipt of the grievance.  (D.I. 46 at ¶ 14; D.I. 52 at ¶¶ 8-9; D.I. 2, ex. B)

On the afternoon of October 18, 2008, plaintiff awoke to find himself being molested by Drozdowski.  (D.I. 2 at ¶¶ 55-56)  When plaintiff yelled for assistance, Drozdowski assaulted him to the point where plaintiff lost consciousness, and attempted intercourse, stopping only upon hearing the keys of a correctional officer. (*Id.* at ¶¶ 56-59)  Correctional officer Madeline Lynch ("Lynch") returned to the tier, where she found plaintiff with blood on his sweater.  (*Id.* ¶ 61)  Plaintiff explained that Drozdowski had assaulted him.  (*Id.* ¶ 62)  Lynch took plaintiff to the medical unit, and plaintiff later told mental health that Drozdowski had tried to rape him.  (*Id.* at ¶¶ 62-63) Mental health informed the DOC, and plaintiff was charged with fighting, but later found not guilty after Drozdowski admitted to the assault.[8]  (*Id.* at ¶¶ 63-64; D.I. 21 at ¶ 64)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[7]Plaintiff acknowledges that he was at that point not housed with Drozdowski, but states that it was because the assault had by then occurred.  (D.I. 2 at ¶ 51)  Plaintiff concedes that Dutton was probably correct in denying the grievance, but asserts that Dutton should have at the time taken steps to protect plaintiff from the risk of assault. (*Id.* at ¶¶ 51, 53-54)

[8]The reporting form for the disciplinary hearing states, "Inmate Drozdowski admitted to hitting Nicholas at his hearing."  (D.I. 2, ex. E)

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Plaintiff asserts that defendants' actions constituted a deliberate indifference to plaintiff's need for protection and contributed to the assault on plaintiff. (D.I. 2 at ¶ 66)

6

Specifically, plaintiff claims that defendants owed a duty of reasonable care to protect him from known, obvious life-threatening risk and assault and to insure proper protection and procedures to carry out this duty. (*Id.* at ¶ 67-68) Plaintiff further complains that defendants' breach of this duty resulted in both physical injuries and psychological trauma. (*Id.* at ¶¶ 70, 75-77) Plaintiff contends that defendants violated his Eighth and Fourteenth Amendment rights against cruel and unusual punishment and of due process and equal protection. (*Id.* at 72)

Defendants now move for summary judgment. State defendants contend that plaintiff cannot establish a claim for liability against Dutton or Lancaster, because they had no personal involvement in the allegations and cannot be held liable on the basis of *respondeat superior*, and because plaintiff has provided insufficient evidence to support a failure to protect claim against Carter. (D.I. 52 at ¶ 14) State defendants further claim that they are immune from liability in their official capacity pursuant to the Eleventh Amendment and the doctrine of sovereign immunity, and immune from liability in their individual capacity based on the doctrine of qualified immunity. (*Id.* at ¶¶ 26-30) Defendant Queen argues that plaintiff has not met his burden to establish a violation of § 1983—that is, he did not show that Queen was aware of a serious medical need and deliberately chose to ignore it. (D.I. 53 at ¶ 8) Defendant Queen further states that plaintiff has not met his burden in establishing a claim for failure to protect. (*Id.* at ¶ 9)

### A. Failure to Protect

On plaintiff's failure to protect claim, state defendants argue for summary judgment in favor of Carter on the basis that, by relying solely on the facts pleaded in

7

his complaint,[9] plaintiff provided insufficient evidence that Carter knowingly and unreasonably disregarded a risk to plaintiff. (D.I. 52 at ¶¶ 20-24) Similarly, defendant Queen argues that plaintiff has not demonstrated sufficient evidence to enable a reasonable jury to find for him on the matter of failure to protect. (D.I. 53 at ¶¶ 7, 9) Queen also argues that plaintiff cannot meet this burden with respect to a claim of deliberate indifference to serious medical needs. (*Id.* at ¶ 8)

The Supreme Court has enunciated two requirements to show a violation of the Eighth Amendment based on a failure to protect. First, "the deprivation alleged must be, objectively, 'sufficiently serious[.]'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1970) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). That is, an inmate must show that there is a substantial risk of harm. *See id.* (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). Second, the inmate must show the prison official had "a sufficiently culpable state of mind." *Id.* (quoting *Wilson*, 501 U.S. at 297). This means that defendant must be deliberately indifferent to inmate health or safety. *Id.* (quoting *Wilson*, 501 U.S. at 302-03). Deliberate indifference is a state of mind "more blameworthy than negligence[,]" and reflecting greater than an "ordinary lack of due care for the prisoner's interests or safety." *Id.* at 835 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Deliberate indifference is determined through a subjective test—that is, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Therefore, the simple presence of a risk is

---

[9]State defendants point out that plaintiff took no depositions, nor did he respond to State defendants' interrogatories or requests for production. (D.I. 52 at ¶ 5)

8

insufficient to establish deliberate indifference where the official did not actually perceive the risk. *Id.* at 838, 847.

This court has explained that, in order to survive a motion for summary judgment on a failure to protect claim, plaintiff must produce sufficient evidence to support the inference that prison officials "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Davis v. Williams*, 572 F. Supp. 2d 498, 507 (D. Del. 2008) (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001)). Knowledge of a risk can be shown either through actual notice, or where there is a "longstanding, pervasive, well-documented, or expressly noted" risk and the circumstances are such that defendant had information regarding the risk that would allow the court to infer that defendant knew about the risk. *See id.* (citing *Nami v. Fauver*, 82 F.3d 63, 67-6 (3d Cir. 1996); *Farmer*, 511 U.S. at 842).

As with the claim for failure to protect, discussed *supra*, to make a claim for deliberate indifference to serious medical needs, plaintiff must show that defendant was aware of a serious risk and disregarded it. *See Farmer*, 511 U.S. at 837; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (explaining that "deliberate indifference to serious medical needs" constitutes a violation of the Eighth Amendment). Inadvertently failing to provide adequate care (i.e., negligent diagnosis or treatment) does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105-06.

With respect to defendant Carter, the court denies entry of a summary judgment in his favor on the issue of failure to protect. Plaintiff alleges that Carter had first-hand knowledge of plaintiff's fears, and admitted to plaintiff first-hand knowledge of Drozdowski's history. (D.I. 2 at ¶¶ 26-33) Carter, on the other hand, denies awareness

9

of plaintiff's fears or Drozdowski's history. (D.I. 52 at ¶¶ 11; *Id.* at ex. 4) Because this discrepancy reflects a genuine issue as to the material fact of whether Carter "knowingly and unreasonably disregarded an objectively intolerable risk of harm," the court cannot grant summary judgment on this issue. *Davis*, 572 F. Supp. 2d at 507.

In contrast, the record reflects that there is insufficient evidence for a jury to reasonably find in favor of plaintiff regarding defendant Queen's liability. *See Anderson*, 472 U.S. at 249. Although plaintiff asserts that he met with Queen three days before the assault, it is undisputed that she did not have the power to move him to protective custody. (D.I. 2 at ¶ 38, D.I. 53 at ¶ 10) Further, Queen took steps to investigate the situation, meeting with Drozdowski on October 15 to perform a mental health evaluation. (D.I. 53 at ¶ 10; D.I. 53, ex. C) Such actions do not suggest a "sufficiently culpable state of mind" on Queen's part, such that liability for failure to protect attaches, nor do they demonstrate a deliberate indifference to a serious medical need. *Farmer*, 511 U.S. at 834 (citations omitted); *Estelle*, 429 U.S. at 105. Therefore, summary judgment in favor of Queen is appropriate.

## B. *Respondeat Superior* Liability of Defendants Dutton and Lancaster

State defendants argue that plaintiff cannot establish a claim against defendants Dutton and Lancaster because they had no personal involvement in the incidents complained of and cannot be held liable on the basis of *respondeat superior*, consistent with the precepts enunciated in *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). The Third Circuit has explained the principle that a "defendant in a civil rights action must have personal involvement in the alleged wrongs" and that liability cannot be based solely on *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.

10

1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)). The Court went on to explain that personal involvement can be shown through allegations of personal direction or "actual knowledge and acquiescence." *Id.* In *Rode*, the Third Circuit found that an assertion that a defendant merely had supervisory responsibility over co-defendants was irrelevant absent a showing that the defendant had personal knowledge of the incidents complained of. *See id.* at 1208. Further, allegations that a supervisory defendant must have personal knowledge of a subordinate's activity because of a grievance filed with his office are insufficient to show that the supervisory defendant had actual knowledge. *See id.*

The court agrees that plaintiff cannot maintain a claim against Dutton and Lancaster on the basis of *respondeat superior*. However, plaintiff also has alleged personal responsibility on the basis that he sent Lancaster a letter requesting protective custody, and Dutton a grievance also requesting protective custody. (D.I. 2 at ¶¶ 46, 48) Indeed, in plaintiff's deposition, he states that he brought the lawsuit against Lancaster because he was Carter's supervisor **and** based on the letter he sent to Lancaster. (D.I. 52, ex. 2 at 3) While liability cannot be premised on a grievance about a subordinate's activity, it appears that plaintiff did not file the letter or grievance as a result of Carter's behavior, but as a plea to Dutton and Lancaster to be moved to a different cell.

Regardless of plaintiff's ability to bring a claim against Dutton and Lancaster about personal involvement, the court finds that the relationship between the letter, the grievance and the assault is too tenuous to justify a trial on the merits. The evidence of

11

record does not demonstrate that Lancaster ever received the letter. (D.I. 52 at ¶¶ 7, 9; *Id.*, ex. 2) Although the record does show that Dutton received the grievance form, it was after the assault on plaintiff had already taken place. (*Id.* at ¶¶ 8-9) Additionally, even if Dutton had received the grievance in time to move plaintiff before his assault, defendants explain that requests for cell reassignment are not processed through the grievance procedure. (*Id.* at ¶ 8) Because it cannot be proven that Lancaster ever received the letter, and because Dutton did not receive the grievance before the assault and could not have taken the steps plaintiff requested even if he had, the court finds that Dutton and Lancaster cannot be held personally responsible for the assault on plaintiff. Therefore, the court grants summary judgment in favor of defendants Dutton and Lancaster.

### C. Sovereign Immunity

State defendants argue that even in the event that the court finds liability under *respondeat superior* or liability of a failure to protect, that they cannot be held liable in their official capacities based on the doctrine of sovereign immunity and the Eleventh Amendment. (D.I. 52 at ¶¶ 26-27)

Because a state is not a person under § 1983, § 1983 does not permit a plaintiff to recover damages against a state. *See Haywood v. Drown*, ___U.S.___, 129 S.Ct. 2108, 2113 n.4 (2009) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)). It has long been held that courts should treat suits against state officials in their official capacity as suits against the state. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Ky. v. Graham*, 473 U.S. 159, 166 (1985)). Therefore under § 1983, a plaintiff cannot recover against a state official acting in his official capacity. For these reasons,

12

the court grants summary judgment in favor of defendants in their official capacity.

## D. Qualified Immunity

Suits against an official in his personal capacity "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 362. While sovereign immunity may protect a state official against suit in his official capacity, individual-capacity suits may proceed under § 1983. *See id.* at 23. However, State defendants argue that, based on the doctrine of qualified immunity, they cannot be liable in their personal capacity. (D.I. 52 at ¶¶ 28-30) Public officials exercising discretionary power retain qualified (rather than absolute) immunity to protect against abuses. *See Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). This doctrine exists so as to prevent the threat of litigation and personal liability from deterring citizens from accepting public office. *See id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

The first step in determining whether an officer receives qualified immunity is to determine whether or not the officer violated a constitutional right. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If so, the court must determine whether, despite the existence of a violation, immunity should shield the officer from liability. *See id.* at 207. In *Curley*, the court looked to whether the right that was violated was clearly established such that a reasonable officer would know that his conduct was unlawful at the time of the violation. *Id.* (citing *Saucier*, 533 U.S. at 202).

State defendants argue that the Supreme Court has loosened this standard, entitling an official to qualified immunity where defendant reasonably believed that his conduct was lawful. *See Pearson v. Callahan*, ___U.S.___, 129 S.Ct. 808, 823 (2009).

13

Interpretation of *Pearson*'s holding is a matter of first impression in this court. The few districts that have considered *Pearson*, however, have interpreted it not as a loosening of the *Saucier* standard, but as a grant of discretion to lower courts as to the order in which to apply the *Saucier* prongs. *See, e.g., Coleman v. Wiencek*, Civ. No. 08-C-5275, 2010 WL 1506708, *6 (N.D. III. Apr. 13, 2010); *Everitt v. DeMarco*, Civ. No. 3:08-cv-543, 2010 WL 1286940, *11 (D. Conn. Mar. 30, 2010). Indeed, although the *Pearson* court held that qualified immunity shields an officer when the "officer reasonably believes that his or her conduct complies with the law," it also stated that an officer is only entitled to immunity where **clearly established** law does not show the officer's actions violated the Constitution. *See Pearson*, 129 S.Ct. at 822-23.

The court finds that qualified immunity does not attach in the case at bar. Regardless of the interpretation of *Pearson*, it is clear that correctional officers have a duty to protect inmates from threats within a prison. Where plaintiff has made a case of failure to protect, qualified immunity does not shield an officer from liability for that failure.

## V. CONCLUSION

For the aforementioned reasons, defendants' motions for summary judgment are granted with respect to defendants Queen, Lancaster, and Dutton, and denied with respect to defendant Carter in his individual capacity. An appropriate order shall issue.

14